**Execution Copy**

injunctions or decrees of any Governmental Entity that apply to the Purchased Assets that restrict the ownership, disposition or use of the Purchased Assets or the conduct of the Business.

Section 4.13    *Employees and Employee Benefits.*

(a)    Schedule 4.13(a) sets forth a list of all currently effective collective bargaining agreements, and other collective bargaining agreements that may apply to the Business, whether or not in effect, memoranda of understanding, settlements or other labor agreements with any union or labor organization that apply to the Business. Except as set forth on Schedule 4.13(a), as of the date hereof: (i) there are no strikes, work stoppages, boycotts, other material concerted actions or material labor disputes pending, or to the Sellers' Knowledge, threatened, with respect to the Employees, and (ii) to the Sellers' Knowledge, no union organization campaign is in progress with respect to the Employees, and no question concerning representation exists respecting the Employees.

(b)    For purposes of this Agreement, the term "Employee Benefit Plan" means an employee pension benefit plan within the meaning of Section 3(2) of ERISA or an employee welfare benefit plan within the meaning of Section 3(1) of ERISA (an "Employee Welfare Benefit Plan"), where no distinction is required by the context in which the term is used. Schedule 4.13(b) lists each Employee Benefit Plan, fringe benefit plan and other incentive compensation or bonus programs, policies and arrangements, whether or not subject to ERISA, that the Sellers or any of their Affiliates maintain with respect to the current or former employees of the Business or to which the Sellers or any of their Affiliates contributes with respect to the current or former employees of the Business (each a "Sellers' Employee Benefit Plan").

(c)    Except as set forth on Schedule 4.13(c): (i) each Seller Benefit Plan has been established and administered in accordance with its terms and in compliance with the applicable provisions of ERISA, the Code and all other applicable laws; (ii) no individual who has performed services for the Sellers has been improperly excluded from participation in any Seller Benefit Plan (disregarding Persons later included with retroactive adjustments to correct the improper exclusion) and (iii) each Seller Benefit Plan that is intended to be qualified under Section 401(a) of the Code has received a favorable determination letter from the Internal Revenue Service to the effect that such Seller Benefit Plan is qualified under the Code and nothing has occurred that could reasonably be expected to cause loss of qualification.

(d)    Except as set forth on Schedule 4.13(d), no Seller Benefit Plan is a "multiemployer plan" (as defined in Section 3(37) of ERISA), and none of the Sellers nor any ERISA Affiliate of any Seller has at any time sponsored or contributed to, or has or had any Liability or obligation in respect of, any multiemployer plan.

(e)    Except as set forth on Schedule 4.13(e), with respect to any Seller Benefit Plan that is not a "multiemployer plan" (as defined in Section 3(37) of ERISA) but is subject to Title IV of ERISA, no "accumulated funding deficiency" (as such term is defined in Section 302 of ERISA and Section 412 of the Code (whether or not waived)) has occurred, no written or oral communication has been received from the Pension Benefit Guaranty Corporation (the "PBGC") in respect of any such Seller Benefit Plan concerning the funded status of any such plan or any transfer of assets and liabilities from any such Seller Benefit Plan in connection with the

transactions contemplated by this Agreement, and no administrative investigation, audit or other administrative proceeding by the Department of Labor, the PBGC, the Internal Revenue Service or other governmental agencies are pending, threatened or in progress (including any routine requests for information from the PBGC).

(f)    Except as set forth on <u>Schedule 4.13(f)</u>, none of the Sellers has any obligation to provide or make available post-employment welfare benefits or welfare benefit coverage for any employee or former employee of any of the Sellers, except as may be required under COBRA and at the expense of the employee or former employee or as may be required pursuant to any other applicable law.

(g)    Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated by this Agreement will (either alone or in combination with another event) (i) result in any payments becoming due, or increase the amount of any compensation due, to any employee of the Sellers; (ii) increase any benefits otherwise payable under any Benefit Plan; (iii) result in the acceleration of the time of payment or vesting or result in any payment or funding (through a grantor trust or otherwise) of any such compensation or benefits; (iv) result in the payment of any amount that would reasonably be expected, individually or in combination with any other such payment, constitute an "excess parachute payment" as defined in Section 280G(b)(1) of the Code; (v) result in the triggering or imposition of any restrictions or limitations on the rights of the sponsor of any Seller Benefit Plan to amend or terminate such Seller Benefit Plan; or (vi) result in a violation of the privacy requirements of HIPAA.

(h)    Except as set forth on <u>Schedule 4.13(h)</u>, none of the Sellers has any plan, contract or commitment, whether legally binding or not, to create any additional employee benefit or compensation plans, policies or arrangements or, except as may be required by applicable law, to modify any Seller Benefit Plan.

(i)    From and after the Closing Date, the Buyer will not incur any liability under WARN if the Buyer makes offers of employment to Employees in accordance with Article VII, the Buyer employs the Transferred Employees as of the Closing Date in accordance with the terms of this Agreement and the Buyer continues to employ the Transferred Employees thereafter (allowing for ordinary course dismissals and terminations). <u>Schedule 4.13(i)</u> shows a true and complete list of all employment terminations, day by day, for the 6 months preceding the date hereof, and shall be updated at Closing to reflect the 90 days up to the Closing Date.

*Section 4.14   Environmental Matters.*

(a)    Except as set forth on <u>Schedule 4.14</u>, the Business is in compliance with all Environmental Laws in connection with the operation of the Business, except for such failures to be in compliance with such Environmental Laws that would not reasonably be expected to result in a liability to the Business in excess of $100,000.

(b)    Except as set forth on <u>Schedule 4.14</u>, no written notices of any violation under any Environmental Law relating to the operations of the Business have been received by the Sellers since December 31, 2003 and to the Sellers' Knowledge, no such notices are threatened.

**Execution Copy**

(c)     Except as set forth on Schedule 4.14, there are no Liens (other than Permitted Liens) on the Purchased Assets based upon any Environmental Law, and to the Sellers' Knowledge, there has not been any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, storing, escaping, leaching, dumping, discarding, burying, abandoning or disposing into the environment (each a "Release") on the Purchased Assets of any toxic or hazardous element, compound or chemical mixture, including without limitation, any contaminant, pollutant, material, waste or other substance that is defined, determined or identified as hazardous or toxic under any Environmental Law, or the Release of which is prohibited under any Environmental Law ("Hazardous Materials"), except for such Releases that would not be reasonably expected to result in a Liability to the Business in excess of $100,000.

Section 4.15    Insurance.  Schedule 4.15 sets forth a true, correct and complete list of all policies or binders of insurance held by the Sellers on the date hereof.  Schedule 4.15 describes any policy or binder of insurance that is not in full force and effect.  Prior to the Due Diligence Date, the Sellers shall provide to the Buyer materials, dated as of May 31, 2005, regarding the loss run of claims made pursuant to such policies.

Section 4.16    Contracts.  Except as set forth on Schedule 4.16, none of the Sellers is a party to, or bound by, nor are any of their respective properties subject to, or bound by, any contract or agreement involving (the "Material Contracts"):

(a)     payments by or to any of the Sellers of more than $100,000 in any 12-month period from or after June 1, 2004 (but excluding nonbinding or non-executory purchase orders);

(b)     the employment of any officer or employee (other than any contract which is terminable without liability upon notice of 90 days or less), or any contract of employment with a former officer or employee, in each case pursuant to which payments in excess of $150,000 are required to be made by any of the Sellers in any 12-month period after the date hereof;

(c)     any outstanding indebtedness for borrowed money by any of the Sellers, other than borrowings under the LaSalle Bank Debt and DIP Financing Facility and other indebtedness not in excess of $250,000 individually or in the aggregate;

(d)     the sharing of profits, losses, costs or liabilities with any other Person in a joint venture agreement, partnership agreement or limited liability company agreement or other agreement (however named) that is material to the Purchased Assets considered as a whole;

(e)     non-competition or exclusivity obligations which would prohibit the Buyer from operating the Business anywhere in the world after the Closing;

(f)     except for guarantees of obligations between or among the Sellers and except pursuant to the LaSalle Bank Debt, any material guarantee or other material contingent liability in respect of any indebtedness or obligation of any Person; and

(g)     any other contract or agreement that is material to the Purchased Assets taken as a whole.

True and complete copies of each Material Contract has been heretofore, or, prior to Closing, will be, provided or made available to Buyer. To the Sellers' Knowledge, subject to payment of the Cure Amounts, if applicable, the Material Contracts are in full force and effect and enforceable in accordance with their terms in all material respects. Subject to the payment of the Cure Amounts, none of the Sellers are in violation or breach of or default under any Material Contract except to the extent excused by or unenforceable as a result of the commencement or pendency of the U.S. Bankruptcy Cases or the application of any provision of the Bankruptcy Code (but only to the extent such excuse, violation, breach, default or application of law will continue to apply in favor of Buyer and its successors and assigns following the Closing) nor, to the Sellers' Knowledge, is any other party to any such Material Contract, except to the extent, individually or in the aggregate, such violation, breach or default of such Material Contract would not reasonably be expected to materially and adversely impair operation of the Business by the Buyer after the Closing.

*Section 4.17   Customers and Suppliers.*

(a)     Schedule 4.17(a) sets forth (i) the names of the ten (10) highest revenue generating customers of the Business for the 12-month period ending December 31, 2004 that together accounted for approximately 95% of the gross revenues of aggregate sales of Jernberg and Iron Mountain during the relevant billing period and (ii) the amount for which each such customer was invoiced during such period. To the Sellers' Knowledge, except as set forth on Schedule 4.17(a), the Sellers have not received any notice (written or oral) that any Top Customer of the Business (A) has ceased, or will cease, to purchase the goods produced by the Business or (B) has materially reduced, or will materially reduce, the purchase of the aggregate goods produced by the Business as a whole, including, in each case, after the consummation of the transactions contemplated hereby.

(b)     Schedule 4.17(b) sets forth the ten (10) largest suppliers of the Business in terms of purchases for the 12-month period ended April 30, 2005, showing the approximate total purchases by the Sellers from each such supplier during such time period.

*Section 4.18   Taxes.*

(a)     All material Tax Returns of the Sellers in respect to the Purchased Assets have been timely filed and are true, correct and complete in all material respects. All material Taxes owed with respect to the Purchased Assets have been fully and timely paid. No Governmental Authority has given written notice of any intention to initiate an audit or similar proceeding with respect to the Purchased Assets, or to assert any deficiency or claim for additional Taxes with respect to the Purchased Assets, and no such audit, deficiency or claim is currently ongoing or outstanding.

(b)     There are no outstanding agreements or requests for agreements to extend or waive the statutory period of limitations applicable to any claim for, or the period for the collection or assessment or reassessment of Taxes due from any Seller with respect to the Purchased Assets.

**Execution Copy**

(c)     There are no Liens for Taxes or Income Taxes upon the assets or properties of any of the Sellers, except for Permitted Liens.

Section 4.19   *LIMITATION ON WARRANTIES*.  EXCEPT AS SET FORTH IN THIS **ARTICLE IV**, NONE OF THE SELLERS OR ANY AFFILIATE OF THE SELLERS MAKES ANY REPRESENTATION OR WARRANTY OF ANY KIND, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, IN RESPECT OF ANY OF THE PURCHASED ASSETS, THE ASSUMED LIABILITIES, THE BUSINESS OR OTHERWISE, OR WITH RESPECT TO ANY INFORMATION PROVIDED TO THE BUYER AND/OR KPS, INCLUDING WITH RESPECT TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR USE OR PURPOSE, TITLE AND NON-INFRINGEMENT.  ALL OTHER REPRESENTATIONS OR WARRANTIES ARE HEREBY DISCLAIMED. EXCEPT TO THE EXTENT SET FORTH IN THIS **ARTICLE IV**, THE SELLERS ARE SELLING, ASSIGNING AND TRANSFERRING THE PURCHASED ASSETS TO THE BUYER ON AN "AS-IS, WHERE-IS" BASIS.

## ARTICLE V
### REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Sellers as follows:

Section 5.1     *Organization*.  The Buyer is duly organized, formed or incorporated and validly existing and in good standing under the laws of the state of such organization, formation or incorporation.  The Buyer has all requisite power and authority to carry on its business as currently conducted.

Section 5.2     *Authorization of Transaction*.  The Buyer has all requisite power and authority to execute and deliver this Agreement and each of the Ancillary Documents to which it is a party, and to perform its obligations hereunder and thereunder.  This Agreement constitutes, and each of the Ancillary Documents executed and delivered by the Buyer constitutes, a valid and legally binding obligation of such Party (assuming that this Agreement and such Ancillary Documents will constitute valid and legally binding obligations of the other parties thereto), enforceable in accordance with its terms and conditions, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer and similar Laws of general applicability relating to or affecting creditors' rights or by general equity principles, including principles of commercial reasonableness, good faith and fair dealing.

Section 5.3     *Noncontravention; Consents*.

(a)     The execution and delivery by the Buyer of this Agreement and the Ancillary Documents to which it is a party, and (subject to the Approval Order) the consummation by the Buyer of the transactions contemplated hereby and thereby, do not: (i) violate any Law to which the Buyer or its assets is subject, (ii) conflict with or result in a breach of any provision of any of its organizational or governance documents, or (iii) create a breach, default, termination, cancellation or acceleration of any obligation under any contract, agreement or binding commitment to which such Party is a party or by which such Party or any of its assets or properties is bound or subject.

31

(b)     No notices, Permits, consents, approvals, authorizations, qualifications or orders of Governmental Entities or third parties are required for the consummation by the Buyer of the transactions contemplated hereby or by the Ancillary Documents.

*Section 5.4     Litigation.* There are no legal, administrative, arbitration or other formal proceedings or governmental investigations pending or, to the knowledge of the Buyer, threatened, that question the validity of this Agreement or any of the Ancillary Documents, or any action taken or to be taken by the Buyer in connection with this Agreement or any of the Ancillary Documents.

*Section 5.5     Availability of Funds.* The Buyer has a binding commitment from KPS to provide $20,000,000 to Buyer for the purpose of paying to the Sellers and LaSalle the Cash Purchase Price Component in accordance with **Section 3.2(a)** and paying the Transaction Expenses. The Buyer's obligations hereunder are not contingent upon procuring financing for the transactions contemplated hereunder.

*Section 5.6     LIMITATION ON THE WARRANTIES OF THE SELLERS.* THE BUYER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT TO THE EXTENT SET FORTH IN **ARTICLE IV**, NONE OF THE SELLERS OR THEIR RESPECTIVE AFFILIATES MAKE ANY REPRESENTATION OR WARRANTY OF ANY KIND, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, IN RESPECT OF ANY OF THE PURCHASED ASSETS, THE ASSUMED LIABILITIES, THE BUSINESS OR OTHERWISE, OR WITH RESPECT TO ANY INFORMATION PROVIDED TO THE BUYER OR KPS, INCLUDING WITH RESPECT TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OR USE, TITLE OR NON-INFRINGEMENT, AND EXCEPT TO THE EXTENT SET FORTH IN **ARTICLE IV**, THE BUYER IS ACQUIRING THE PURCHASED ASSETS ON AN "AS-IS, WHERE-IS" BASIS.

### ARTICLE VI
### COVENANTS

*Section 6.1     General.* Each of the Parties will use commercially reasonable efforts to take or cause to be taken all actions and to do or cause to be done, as soon as practicable, all things necessary, proper or advisable (subject to any Laws) to consummate the Closing and the other transactions contemplated by this Agreement, including the negotiation, execution and delivery of any additional instruments necessary to consummate the transactions contemplated by this Agreement or the Ancillary Documents. Neither of the Parties will, without prior written consent of the other Party, take or fail to take, or permit their respective Affiliates to take or fail to take, any action, which would reasonably be expected to prevent or materially impede, interfere with or delay the consummation, as soon as possible, of the transactions contemplated by this Agreement or the Ancillary Documents; provided, that nothing in this **Section 6.1** will require a Party to cure any breach or inaccuracy with respect to any representation or warranty contained in this Agreement or any Ancillary Documents.

*Section 6.2     Notices and Consents.*

**Execution Copy**

(a)    Prior to the Closing Date, the Buyer and the Sellers will use commercially reasonable efforts to give all notices required to be given by the Buyer or the Sellers and to obtain all material consents, approvals or authorizations of any third parties (including any Governmental Entity), and those in connection with the HSR Act and antitrust and competition Laws of any other applicable jurisdiction, if applicable, that are required to be obtained by the Sellers in connection with the transactions contemplated by this Agreement. In connection with the foregoing, each Party will (a) promptly notify the other Party of any written communication to that Party or its Affiliates from any Governmental Entity and, subject to Law, provide the other Party with a copy of any written communication to any of the foregoing and (b) not participate in any substantive meeting or discussion with any Governmental Entity in respect of any filings, investigation or inquiry concerning the transactions contemplated by this Agreement unless it consults with the other Party in advance and, to the extent permitted by such Governmental Entity, give the other Party the opportunity to attend and participate thereat, with respect to this Agreement or the Ancillary Documents and the transactions contemplated hereby or thereby. Nothing contained herein will require any Party to pay any consideration (except filing and application fees) to any other Person from whom any such consents, approvals or authorizations are requested.

(b)    Each of the Sellers and the Buyer shall (i) not later than August 1, 2005 make their initial filing under the HSR Act and make or cause to be made all filings, applications and notifications, and will supply or cause to be supplied all information, as may be required under the HSR Act and any antitrust or competition Laws of any other applicable jurisdiction with respect to the transactions contemplated hereby and (ii) thereafter furnish all additional information requested under the HSR Act or other such Laws as soon as practicable after receipt of a request therefor and take such actions as may be required to obtain approval, consent or waiver under the HSR Act or such other Laws; provided, that nothing herein shall require the Buyer to enter into any consent decree or agreement to hold separate or divest any of the Purchased Assets.

*Section 6.3    Conduct of the Business.*

(a)    Subject to any order of the Bankruptcy Court and the requirements of the Bankruptcy Code, the Sellers shall ensure that, after the date hereof and prior to the Closing Date, except (x) as expressly provided by or contemplated under this Agreement, (y) as set forth on Schedule 6.3 or (z) with the prior written consent of the Buyer:

(i)    the Sellers use commercially reasonable efforts under the circumstances to conduct the Business in the ordinary course consistent with past practice in all material respects;

(ii)    the Sellers shall not (A) except as budgeted in connection with the DIP Facility, incur any Indebtedness or (B) assume or guarantee the obligations of any other Person;

(iii)    the Sellers shall not make any loans, advances or capital contributions to, or investments in, any other Person, other than travel and entertainment advances to employees in the ordinary course of business consistent with past practice;

33

(iv)    the Sellers shall not sell, transfer, lease, sublease, license, relinquish, surrender, encumber or otherwise dispose of any material Purchased Asset, except for the sale, transfer, lease, sublease, license or other disposition of obsolete equipment and inventory in the ordinary course of business;

(v)    the Sellers shall not change any method of accounting or accounting practice used by it (including procedures with respect to the payment of accounts payable and collection of accounts receivable), except for any change required by GAAP or Law;

(vi)    the Sellers shall not, except as may otherwise be required by applicable Law or the terms of any Sellers' Employee Benefit Plan existing as of the date of this Agreement:  (A) increase the compensation or fringe benefits of any present or former Employee or director of the Sellers (except for increases in salary or hourly wage rates in the ordinary course of business consistent with past practice), (B) grant any severance or termination pay to any present or former Employee or director of the Sellers, (C) loan or advance any money or other property to any present or former Employee or director of the Sellers, (D) establish, adopt, enter into, amend or terminate any Sellers' Employee Benefit Plan or any plan, agreement, program, policy, trust, fund or other arrangement that would be a Sellers' Employee Benefit Plan if it were in existence as of the date of this Agreement, or (E) grant any equity or equity-based compensation awards to any current or former Employee or director of the Sellers.

(vii)    the Sellers shall use commercially reasonable efforts under the circumstances to keep or cause to be kept its material existing insurance policies (or substantial equivalents) in such amounts duly in force as of the date hereof and shall give the Buyer notice of any material change in its insurance policies;

(viii)    the Sellers shall not agree to make any capital expenditures except capital expenditures that do not exceed $1,000,000, individually, and $1,000,000, in the aggregate, or acquire any business or other assets (other than Inventory in the ordinary course of business consistent with past practice);

(ix)    the Sellers will use commercially reasonable efforts under the circumstances to cause the Real Property, Equipment and Inventory included in the Purchased Assets to be maintained in substantially the same condition (normal wear and tear and obsolescence excepted) that it has heretofore maintained same and shall operate the Real Property in substantially the same manner as it has heretofore operated same; and the Sellers shall promptly inform the Buyer in writing of any material adverse change to the ownership, use, occupancy, leasing or operation of any Real Property, whether or not insured against;

(x)    the Sellers shall not establish, amend, modify or terminate any Employee Benefit Plan in respect of any Employee or otherwise modify (including the amount or timing of payment) the compensation of or benefits provided to, any Employee, or promise or become obligated to do any of the foregoing;

34

(xi)    the Sellers shall conduct the Business in compliance with Laws in all material respects, and the Sellers shall use commercially reasonable efforts under the circumstances to maintain, preserve, renew and keep in full force and effect all material Permits included in the Purchased Assets in all material respects; and

(xii)    the Sellers shall not authorize or enter into any Contract to take any action that would reasonably be expected to constitute a breach of any of the foregoing.

(b)    Prior to the Closing, each Seller shall (i) exercise, consistent with the terms and conditions of this Agreement, complete control and supervision of the operation of the Business and (ii) use its commercially reasonable efforts under the circumstances to preserve intact its business organizations and relationships with third parties relating to the Business and to keep available the services of its respective current officers and key employees, subject to the terms of this Agreement, and in each case, subject to any obligations as a debtor or debtor-in-possession under the Bankruptcy Code or order of the Bankruptcy Court or other court of competent jurisdiction.

*Section 6.4    Transfer Taxes.*    The Sellers and the Buyer will use commercially reasonable efforts and cooperate in good faith to exempt the sale, conveyance, assignments, transfers and deliveries to be made to the Buyer hereunder from any transfer, sales, use, stamp duty, value-added, documentary, registration, recording and other similar Taxes (collectively, "Transfer Taxes") payable in connection with such sale, conveyance, assignments, transfers and deliveries, to the extent provided by Section 1146(c) of the Bankruptcy Code and other applicable Law. In the event that any Transfer Taxes are assessed or are required to be paid with respect to such sale, conveyance, assignments, transfers or deliveries, such Transfer Taxes shall be borne and paid one-half by the Sellers out of proceeds of the Sellers' Cash Component and one-half by the Buyer. The Sellers and the Buyer will execute, deliver and cooperate in timely filing all Tax Returns required to be filed in connection with the payment of such Taxes.

*Section 6.5    Prorations.*    All Taxes and all rents, utilities and other charges against, or payable with respect to, any of the Purchased Assets (including the Real Property) relating to a time period beginning prior to, and ending after, the Closing (the "Apportioned Obligations") shall be calculated as of Closing, and shall be prorated (based on the most recent available tax statement, latest tax valuation and latest bills) based on the number of days in the relevant period falling on and before the Closing (the "Pre-Closing Period"), and the number of days in the relevant period falling after the Closing (the "Post-Closing Period"). If the Closing occurs before the amount of an Apportioned Obligation is fixed for a relevant time period, the amount of such Apportioned Obligation shall be deemed to be calculated based on the amount of such Apportioned Obligation for the prior equivalent time period. The Sellers will be responsible for the Apportioned Obligations allocated to the Pre-Closing Period, and the Buyer will be responsible for the Apportioned Obligations allocated to the Post-Closing Period. The Sellers will pay Apportioned Obligations that are due and payable on or prior to the Closing Date, and will be paid at Closing by the Buyer for any part of that amount apportioned to the Buyer. The Buyer will pay Apportioned Obligations that are due and payable after the Closing Date and will be paid at Closing by the Sellers for any part of that amount apportioned to the Sellers. Any refund, rebate or similar payment received by or credited to either the Buyer or the Seller that is

properly apportioned to the other Party pursuant to the principles of this **Section 6.5** will be timely paid over to such other Party.

    *Section 6.6    Tax Sharing Agreements.*  On or prior to Closing, the Sellers will terminate all Tax or Income Tax allocation or sharing agreements, if any, to the extent they are related to the Purchased Assets, provided, however, that for the avoidance of doubt this **Section 6.6** shall not apply to any customary provisions relating to the payment of Taxes in any leases to which the Leased Real Property is subject.

    *Section 6.7    Access to Business, Records and Documents.*

    (a)    Except as may be prohibited by Law, by the terms of any contract or under any confidentiality or non-disclosure agreement, prior to the Closing (provided, that the Sellers have advised the Buyer of the nature of any such restriction and made such disclosure as is permitted), the Sellers will (a) upon reasonable notice, permit representatives of the Buyer to have reasonable access during normal business hours and under reasonable circumstances to all personnel, premises, properties, assets, Books, Records, Contracts and documents of the Business and (b) furnish the Buyer with financial and all other information in the Sellers' possession relating to the Business and the Purchased Assets and Assumed Liabilities as the Buyer may from time to time reasonably request; provided, however that the Buyer may not under any circumstances conduct or cause to be conducted any intrusive or invasive environmental testing at any of the properties of the Sellers, including any of the Leased Real Property.

    (b)    The Buyer will preserve and maintain all Books and Records included in the Purchased Assets (including all items under **Section 2.2(a)(viii)**) and Assumed Liabilities for a period of six (6) years following the Closing Date.  After such six-year period, the Buyer will provide at least sixty (60) days prior written notice to the Sellers of its intent to dispose of any such Books and Records, and the Sellers and their respective Affiliates will be given the opportunity, at their cost and expense, to remove and retain all or any part of such books and records as they may select.  During such six-year period, duly authorized representatives of the Sellers and their respective Affiliates will, upon reasonable notice, have reasonable access during normal business hours to examine, inspect and copy such Books and Records; provided, that to the extent that disclosing any such information would reasonably be expected to constitute a waiver of attorney-client, work product or other privilege with respect thereto, the Parties will take all commercially reasonable action to prevent a waiver of any such privilege, including entering into an appropriate joint defense agreement in connection with affording access to such information.

    *Section 6.8    Bankruptcy Proceedings.*

    (a)    Each of the Sellers shall file with the Bankruptcy Court (i) a Chapter 11 petition seeking relief as a debtor-in-possession in the Bankruptcy Case and (ii) a motion seeking entry of the Bid Procedures Order (the "Bankruptcy Filing").

    (b)    (i) The Sellers shall use commercially reasonable efforts to have the Bankruptcy Court enter the Bid Procedures Order within twenty (20) days after the Bankruptcy Filing, and

(ii) the Sellers shall use commercially reasonable efforts to have the Bankruptcy Court enter the Approval Order within forty-five (45) days after the Bankruptcy Filing, which date the Buyer may waive or extend in its reasonable discretion; provided the Buyer is the successful bidder at the Auction.

(c)     The term "Bid Procedures Order" means an order from the Bankruptcy Court pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code (i) authorizing and scheduling an auction (the "Auction"); (ii) approving the procedures for the submission of Qualified Bids and providing that all Qualified Bids shall be served upon the Buyer; (iii) in the case of any subsequent Qualified Bids, approving an initial overbid of $4,000,000 and incremental bid protections of at least $500,000 thereafter; (iv) approving the Break-Up Fee and Expense Reimbursement as a first priority administrative expense under sections 503(b)(1) and 507(a)(1) of the Bankruptcy Code and authorizing the Buyer to "credit bid" the Break-Up Fee and Expense Reimbursement at the Auction; (v) scheduling a hearing to consider approval of such sale; (vii) approving the form and manner of notice of bid procedures and sale hearing; and (viii) approving procedures for the assumption of executory contracts and unexpired leases, which order shall be submitted to the Bankruptcy Court in form and substance reasonably acceptable in all respects to the Buyer and otherwise consistent with this Agreement.

(d)     The term "Approval Order" means an order from the Bankruptcy Court, in form and substance reasonably satisfactory in all respects to the Buyer and otherwise consistent with this Agreement, and approving the sale of the Purchased Assets to the Buyer and the assumption of the Assumed Contracts and Assumed Liabilities by the Buyer and the conveyance of permits under this Agreement pursuant to Sections 105, 363(b), 363(f) and 365 of the Bankruptcy Code, and which, among other things, (i) approves the transaction contemplated by this Agreement on the terms set forth herein; (ii) finds that, as of the Closing Date, the transactions contemplated by this Agreement effect a legal, valid, enforceable and effective sale and transfer of the Purchased Assets to the Buyer and shall vest the Buyer with title to the Purchased Assets free and clear of all Liens, other than Permitted Liens, Claims and encumbrances; (iii) finds that the consideration provided by the Buyer pursuant to this Agreement constitutes reasonably equivalent value and fair consideration for the Purchased Assets; (iv) finds that, as of the Closing Date, the Assumed Contracts will have been duly assumed by the Sellers and assigned to the Buyer in accordance with Sections 365 and 105 of the Bankruptcy Code; (v) finds that the Buyer is a "good faith Buyer" within the meaning of Section 363(m) of the Bankruptcy Code and is thereby entitled to the protection afforded a good faith, arm's-length Buyer; (vi) finds that this Agreement was negotiated at arm's-length; (vii) finds that the Buyer does not have any interest in the Sellers or in any party affiliated with the Sellers; (viii) finds that the sale of the Assets hereunder was conducted in a "non-collusive manner" within the meaning of Section 363(n) of the Bankruptcy Code; (ix) orders that the Assumed Contracts assumed by the Sellers and assigned to the Buyer pursuant to this Agreement will be transferred to, and remain in full force and effect for the benefit of, the Buyer (or its designated transferee(s)), notwithstanding any provision in any such Assumed Contract or in applicable law (including those described in Sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts or limits in any way such assignment or transfer; (x) approves the Ancillary Documents; (xi) finds that the Buyer gave due and proper notice of the transaction contemplated by this Agreement to each party entitled thereto; (xii) finds that the Buyer is not a successor of the Sellers; and (xiii) orders that, notwithstanding Sections 6004(g)

and 6006(d) of the Bankruptcy Code, the Approval Order is not stayed and is effective immediately upon entering.

(e)    (i) The Buyer shall have until the date that is ten (10) business days prior to the Auction to designate, by written notice to the Sellers, the Assumed Contracts that it wishes the Sellers to assume and assign to the Buyer, and the Assumed Contracts so identified in such notice shall be set forth on Schedule 2.2(a)(iii); and (ii) no less than three (3) business days prior to the hearing for the Approval Order, the Buyer may elect, by written notice to the Sellers, to have any of the executory contracts or unexpired leases set forth on Schedule 2.2(a)(iii) not be assigned to and assumed by the Buyer, and any such contracts or leases so identified in such notice shall be removed from Schedule 2.2(a)(iii); provided, however, notwithstanding anything to the contrary, Schedule 2.2(a)(iii) shall at all times include each Key Customer Contract and Key Vendor Contract.

(f)    The Sellers shall provide the Buyer with drafts of all material documents, motions, orders, filings or pleadings that the Sellers propose to file with the Bankruptcy Court which relate to (i) the entry of the orders described in this **Section 6.8**; (ii) the transactions contemplated by this Agreement, including in connection with the approval of the Approval Order; (iii) the assumption or rejection of any executory contract or unexpired lease of the Sellers; (iv) the settlement of any Claim against the Sellers; (v) the restructuring or refinancing of any form of Indebtedness or lease of the Sellers; and (vi) the appointment of a trustee or examiner under Chapter 11 of the Bankruptcy Code, in the Bankruptcy Case, so as to provide the Buyer's counsel with a reasonable opportunity to review and comment on the same prior to the filing thereof in the Bankruptcy Court. The Sellers shall give appropriate notice and provide appropriate opportunity for a hearing to all parties entitled thereto of all motions, orders, hearings, or other proceedings relating to this Agreement or the transactions contemplated by this Agreement, including in connection with the approval of the Approval Order. The Sellers shall be required to consult and reasonably cooperate with the Buyer and consider, in good faith, the views of the Buyer with respect to the filings contemplated under this Agreement.

(g)    The Sellers shall comply (or obtain an order from the Bankruptcy Court waiving compliance) with all requirements under the Bankruptcy Code and Federal Rules of Bankruptcy Procedure in connection with obtaining approval of the sale of the Purchased Assets under this Agreement. Except as otherwise permitted by the Bankruptcy Court, notice of all applicable hearings, motions and orders and the objection deadline shall be served by the Sellers in accordance with Rules 2002, 6004, 6006, 9014 and any other applicable rule of the Federal Rules of Bankruptcy Procedure and any applicable local rules of the Bankruptcy Court on all Persons required to receive notice in the Bankruptcy Case under such rules, including all Persons who have asserted Liens with respect to the Purchased Assets, all non-debtor parties to all Assumed Contracts, counsel to the OCUC, (if appropriate), the Office of the United States Trustee, all indenture trustees for debt issued by the Sellers, and each of the Sellers' creditors.

(h)    If the Bid Procedures Order, Approval Order or any other order of the Bankruptcy Court relating to this Agreement is objected to or appealed by any party (or a petition for certiorari, motion for re-hearing, reargument, reconsideration or revocation, or other motion attaching the order, is filed with respect thereto), the Sellers will use their commercially reasonable efforts to defend against such objection, appeal, petition or motion and to obtain an

**Execution Copy**

expedited resolution of any such appeal, petition or motion, in any such case, with the objective of effecting the transactions contemplated by this Agreement on the terms and subject to the conditions set forth herein.

(i)      Notwithstanding anything to the contrary contained in this Agreement, in the event the Buyer so requests in writing within 30 days after the Closing, the Sellers agree to pursue (at the Buyer's sole cost and expense) any claims for insurance for damage to or destruction of any Purchased Asset in connection with matters arising after the Petition Date but prior to the Closing Date, and to remit any proceeds received with respect thereto, net of any costs and expenses incurred by the Sellers, to the Buyer.

(j)      Certain indebtedness of the Sellers are secured by Liens on certain of the Purchased Assets.  Pursuant to and by virtue of the Approval Order, all such Liens (other than Permitted Liens) will be discharged and will attach to the proceeds from the sale of the Purchased Assets.

(k)      Promptly after the entry of the Bid Procedures Order, the Buyer shall serve on all parties (including all parties to the Assumed Contracts and all Persons who would appear on any search conducted to determine those Persons asserting a Lien on the Sellers' assets) to whom service of the Sale Notice (as defined in the Bid Procedures Order) is required under the terms of the Bid Procedures Order notice, in form and substance reasonably satisfactory to the Buyer, disclosing the material terms of this Agreement, the Bid Procedures Order (including the procedure for the submission of Qualified Bids) and the identity of the Buyer.

(l)      The Sellers agree that they shall promptly take such actions as are reasonably necessary to obtain the entry of an order of the U.S. Bankruptcy Court, in form and substance reasonably satisfactory to the Buyer and otherwise consistent with this Agreement, which shall provide for the assumption of and assignment to the Buyer of the Assumed Contracts and Permits being conveyed hereunder and thereunder, and the payment of all Cure Amounts by the Buyer as set forth in **Section 3.2.**

Section 6.9     *Alternative Transactions.*

(a)      Prior to the Bankruptcy Filing, the Sellers are prohibited from (i) soliciting, initiating or encouraging (including by way of furnishing information), or taking any other action designed to facilitate, any inquiries or the making of any proposal which constitutes an Alternative Transaction or (ii) participating in any discussions or negotiations regarding, or furnishing to any Person (other than its legal and other business advisors) any information with respect to, or taking any action to knowingly facilitate, any Alternative Transaction or the making of any Alternative Transaction.

(b)      From and after the Bankruptcy Filing, the Sellers are permitted to, and to cause their representatives and Affiliates to, initiate contact with, solicit or encourage (including by way of furnishing information), or take any other action designed to facilitate, the submission of any Alternative Transactions and any inquiries, proposals or offers by any Person (in addition to the Buyer and its Affiliates, agents and representatives) that might lead to an Alternative Transaction and to engage in any discussions and negotiations relating thereto, so long as the

**Execution Copy**

Sellers do not sign a definitive agreement for any such Alternative Transaction absent Bankruptcy Court approval. In addition, the Sellers may respond to any Alternative Transactions and perform any and all other acts related thereto that are required under the Bankruptcy Code or other applicable Law, including supplying information relating to the Business and Purchased Assets.

Section 6.10    *Publicity.*  Following the date hereof, until the Closing or the date the Agreement is terminated or abandoned pursuant to **Article IX**, the Sellers and the Buyer may not issue or cause the publication of any press release or other general media communication with respect to this Agreement or the transactions contemplated hereby, including communications with the Sellers' employees (including organized labor representatives), creditors, customers and suppliers, without prior consultation with the other Party, <u>provided,</u> that each Party shall provide the other with a reasonable opportunity to review and comment on any such press release or general media communication.

Section 6.11    *Contacts with Suppliers, Customers and Other Parties.*  Prior to the Closing, the Buyer and its representatives may, with the consent of the Sellers, not to be unreasonably withheld or delayed, contact, and discuss this Agreement and the transactions contemplated hereby with, any supplier to, or customer of, the Business, counterparties to any Contracts or any Governmental Entity and, with the participation of the Sellers, any employees of the Sellers or organized labor representative.

Section 6.12    *Real Property Leases.*  Prior to the Closing Date, no Seller shall amend, modify, supplement, extend, renew or terminate any Real Property Lease, or enter into any agreement otherwise affecting the Leased Real Property (including property management agreements, service agreements, subleases or licenses with respect thereto) without the Buyer's prior written consent in each such instance. Notwithstanding the foregoing, the Buyer and the Sellers shall negotiate in good faith, and enter into, new Leases for all Leased Real Property in respect of which the landlord is an Affiliate of any of the Sellers, which new Leases shall be Assumed Contracts.

Section 6.13    *Ancillary Documents.*  On or prior to the Closing Date, each of the Buyer and the Sellers shall execute and deliver to the other party thereto the Ancillary Documents to which it is a party.

Section 6.14    *Delivery of Seller Disclosure Schedules.*  Notwithstanding anything to the contrary, (i) the Sellers shall deliver the Seller Disclosure Schedules to the Buyer, and (ii) the Buyer and the Sellers shall jointly deliver to each other all other Schedules, no later than five (5) business days prior to the Due Diligence Date, and upon such delivery, the Seller Disclosure Schedules and such other Schedules shall be incorporated into this Agreement in accordance with Section 10.12 hereof.

Section 6.15    *No Recourse.*  The Buyer shall have no recourse against the Sellers' officers and directors in connection with or relating to any of the representations and warranties contained in **Article IV**.

40

**Execution Copy**

**ARTICLE VII**
**EMPLOYEE MATTERS**

*Section 7.1    Employment.*

(a)    The Buyer will offer to employ, commencing upon the Closing, each Employee of the Sellers who is, as of immediately prior to the Closing, subject to any of the CBAs and (i) actively at work in connection with the Business, (ii) on short-term disability or workers' compensation in connection with the Business, (iii) on a leave of absence approved by the Sellers in connection with the Business or (iv) on layoff with recall rights as provided under any of the CBAs (collectively, the "Union Employees"), but not including any person on long-term disability, layoff without recall rights under any of the CBAs or on a leave of absence with no prior agreement or understanding to return to employment with the Sellers at the end of such disability, layoff or leave, on terms and conditions in compliance with any of the CBAs. Union Employees who accept such offer of employment will be referred to in this Agreement as "Transferred Union Employees." From and after the Closing, the Buyer will retain all rights and obligations it may have pursuant to the CBAs and applicable labor law. Schedule 7.1(a) sets forth all Employees who are subject to any of the CBAs and who are on long-term disability, layoff without recall rights under any of the CBAs or on a leave of absence with a prior agreement or understanding to return to employment with the Sellers at the end of such disability, layoff or leave.

(b)    The Buyer will offer to employ, commencing upon the Closing, each Employee of the Sellers who is, as of immediately prior to the Closing, not subject to any of the CBAs and (i) actively at work in connection with the Business, (ii) on short-term disability or workers' compensation in connection with the Business or (iii) on a leave of absence approved by the Sellers in connection with the Business, but not including any Employee on long-term disability or on a leave of absence with no prior agreement or understanding to return to employment with the Sellers at the end of such disability or leave (collectively, the "Nonunion Employees"). Nonunion Employees who accept such offer of employment will be referred to in this Agreement as "Transferred Nonunion Employees." Notwithstanding the foregoing, nothing in this Agreement will, after the Closing Date, impose on the Buyer any obligation to retain any Transferred Nonunion Employee in its employment. Schedule 7.1(b) sets forth all Employees who are not subject to any of the CBAs and who are on long-term disability or leave who have a prior arrangement or understanding to return to employment when such leave or disability ends. Nothing in this Agreement shall restrict the Buyer's right to terminate the employment of any Person following the Effective Time.

(c)    Transferred Nonunion Employees and Transferred Union Employees will collectively be referred to as "Transferred Employees." Except as described in the remaining sentences of this **Section 7.1(c)**, the employment of each such Transferred Employee with the Buyer will commence immediately upon the Closing. In the case of any individual who is absent from active employment and receiving short-term disability or workers' compensation benefits, the employment of such individual with the Buyer will commence upon his or her return to active work, and such individual will become a Transferred Employee as of such date.

41

(d)     Notwithstanding anything to the contrary, at the Closing, the Buyer shall enter into the employment agreements and a consulting agreement, which include the terms set forth in the form of Equity Participation Agreement attached hereto as Exhibit A (the "Equity Participation Agreement").

Section 7.2     *Employee Benefit Matters.*

(a)     As of the Closing, all of the Transferred Employees will cease participation in any of the Sellers' Employee Benefit Plans and fringe benefit programs that such Transferred Employees participated in immediately prior to the Closing.  Transferred Employees shall be fully vested in their defined contribution accounts as of the Effective Time.

(b)     In accordance with Treasury Regulation Section 54.4980B-9 Q&A-7, as of the Closing Date, the Buyer will assume all liability for providing and administering all required notices and benefits under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA") to all Transferred Employees.  The Sellers will have no COBRA liability or obligations to such Transferred Employees after the Closing Date.

(c)     The Buyer and the Sellers acknowledge and agree that the Buyer constitutes a "successor employer" within the meaning of Code Section 3121(a)(1) and Code Section 3306(b)(1) and the regulations thereunder.  Accordingly, the Buyer agrees to treat all wages paid to the Employees as paid by a successor employer for all federal and state income tax and employment Tax purposes.

Section 7.3     *Defined Contribution Plans.*  As of the Closing Date, with respect to any Defined Contribution Plan of the Sellers maintained by or for the benefit of any of the Transferred Employees, the Transferred Employees will cease to participate in such Defined Contribution Plan.  As of the Closing Date or as soon as practicable thereafter, each Transferred Employee will be permitted to elect a distribution of his or her account balance in the Defined Contribution Plan of the Sellers and will be permitted to roll over his or her account balances in such plan (or any portion thereof) to the Defined Contribution Plan of the Buyer, including the ability to rollover any existing loans under such plan of the Sellers for sixty (60) days after the Closing Date.

Section 7.4     *Compliance with WARN.*  With respect to the Employees, the Buyer will have full responsibility under the Worker Adjustment and Retraining Notification Act of 1988, as amended, and any other similar statutes or regulations of any jurisdiction relating to any plant closing or mass layoff (together, "WARN") caused by the Buyer on or after the Closing Date. For these purposes, a plant closing or a mass layoff will be deemed to have been caused by the Buyer on or after the Closing Date if such plant closing or mass layoff would not have occurred but for the Buyer's failure to make offers of employment to Employees in accordance with this **Article VII**, the Buyer's failure to employ the Transferred Employees on the Closing Date in accordance with the terms of this Agreement and/or the Buyer's failure to employ the Transferred Employees thereafter.  The Sellers shall be responsible for all other WARN Liabilities relating to the periods prior to the Closing Date.

42

# ARTICLE VIII
## CLOSING CONDITIONS

*Section 8.1    Conditions to Obligations of the Buyer.* The obligations of the Buyer to effect the Closing are subject to the fulfillment or waiver on or before the Closing Date of the following conditions:

(a)    The representations and warranties of the Sellers contained in this Agreement or the Ancillary Documents that are qualified as to materiality or Material Adverse Effect, shall be true and correct and the representations and warranties of Sellers contained in this Agreement or the Ancillary Documents that are not so qualified shall be true and correct in all material respects, as of the Due Diligence Date and as of the Closing Date, except for changes therein specifically permitted by this Agreement or the Ancillary Documents and except that representations and warranties made with respect to a specified date need only be true and correct in all material respects as of such date.

(b)    The covenants and agreements contained herein or in any Ancillary Documents to be performed or complied with by the Sellers on or prior to the Closing Date shall have been performed or complied with in all material respects, and the Sellers shall have delivered a certificate confirming the foregoing.

(c)    All of the Required Consents shall have been obtained or given, as applicable, and be in full force and effect;

(d)    There shall be no litigation pending or, to the Sellers' Knowledge, threatened, in which any injunction is sought to prevent the transactions contemplated hereby, or the transfer of the Purchased Assets to the Buyer, free and clear of all Liens, except Permitted Liens.

(e)    The Sellers, as applicable, will have delivered to the Buyer:

(i)    a certificate, dated the Closing Date, duly executed by an officer of each of the Sellers to the effect of **Section 8.1(a)** and **8.1(b)** above;

(ii)    a duly executed counterpart of the bill of sale and assignment and assumption agreement in substantially the form attached as Exhibit B (the "Bill of Sale and Assignment and Assumption Agreement");

(iii)    a counterpart to each of the Equity Participation Agreements, duly executed by the employee thereunder; and

(iv)    such other instruments of sale, transfer, conveyance and assignment as the Buyer may reasonably request to effect the transactions contemplated thereby.

(f)    The Buyer shall have satisfactorily completed on or before August 1, 2005 (the "Due Diligence Date"), its business, environmental, legal, real estate and accounting due diligence investigation of the Business to its satisfaction (the "Due Diligence Condition"); provided, however, that the Due Diligence Condition shall be deemed satisfied and/or

irrevocably waived unless the Buyer delivers a written notice stating otherwise to the Sellers on or prior to the Due Diligence Date.

(g)     The USW shall have ratified, amended or modified the CBAs on or before the August 12, 2005 (the "Ratification Date"), with material terms reasonably satisfactory to the Buyer (the "Ratification Condition"); provided, however, that the Ratification Condition shall be deemed satisfied and/or irrevocably waived unless the Buyer delivers a written notice stating otherwise to the Sellers on or prior to the Ratification Date.

(h)     The customer contracts identified on Schedule 8.1(h) (the "Key Customer Contracts") shall have been amended or modified on or before August 1, 2005 (the "Key Customer Date"), with material terms reasonably satisfactory to the Buyer (the "Key Customer Condition"); provided, however, that the Key Customer Condition shall be deemed satisfied and/or irrevocably waived unless the Buyer delivers a written notice stating otherwise to the Sellers on or prior to the Key Customer Date.

(i)     The LaSalle Bank Debt shall have been amended or modified (the "New LaSalle Financing") on or before the August 1, 2005 (the "LaSalle Debt Date"), with material terms reasonably satisfactory to the Buyer (the "LaSalle Debt Condition"); provided, however, that the LaSalle Debt Condition shall be deemed satisfied and/or irrevocably waived unless the Buyer delivers a written notice stating otherwise to the Sellers on or prior to the LaSalle Debt Date.

(j)     The vendor contracts identified on Schedule 8.1(j) (the "Key Vendor Contracts") shall have been amended or modified on or before the August 1, 2005 (the "Key Vendor Date"), with material terms reasonably satisfactory to the Buyer (the "Key Vendor Condition"); provided, however, that the Key Vendor Condition shall be deemed satisfied and/or irrevocably waived unless the Buyer delivers a written notice stating otherwise to the Sellers on or prior to the Key Vendor Date.

(k)     The Bankruptcy Court shall have entered (i) the Bid Procedures Order within twenty-five (25) days after the Bankruptcy Filing and (ii) the Approval Order within fifty-five (55) days after the Bankruptcy Filing; provided, that the condition contained in **Section 8.1(k)(i)** shall be deemed satisfied and/or irrevocably waived unless the Buyer has terminated this Agreement pursuant to **Section 9.1(g)** prior to the entry of the Bid Procedures Order, and the condition in **Section 8.1(k)(ii)** shall be deemed satisfied and/or irrevocably waived unless the Buyer has terminated this Agreement pursuant to **Section 9.1(h)** prior to the entry of the Approval Order.

(l)     Each Seller shall have furnished the Buyer with a certificate stating that such Seller is not a "foreign" Person within the meaning of Section 1445 of the Code, which certificate shall set forth all information required by, and otherwise be executed in accordance with, Treasury Regulation Section 1.1445-2(b)(2).

(m)     (i) The Buyer shall have received a leasehold extended coverage policy of title insurance with respect to each parcel of Leased Real Property, in each case issued on the Closing Date by a title insurance company reasonably acceptable to counsel for the Buyer (the "Title Company"), (ii) each such title insurance policy shall be in an amount reasonably sufficient to

44

insure the Buyer's leasehold title without any of the <u>Schedule B</u> standard preprinted exceptions (other than taxes not yet due and payable) and free and clear of all Liens and other exceptions to or exclusions from coverage other than Permitted Liens, (iii) each such title insurance policy shall otherwise be in form reasonably satisfactory to counsel for the Buyer, and (iv) each Seller shall have delivered any reasonable and customary title affidavits, indemnities and other documents reasonably requested by the Buyer or the Title Company in connection with the issuance of such title policies and the omitting of all title exceptions other than Permitted Liens; provided that the Buyer shall use commercially reasonable efforts to obtain and or effectuate all of the foregoing.

(n)     The Bid Procedures Order shall have remained in full force and effect and shall not have been stayed, vacated, modified or supplemented without prior written consent of the Buyer and the Sellers.

(o)     The Approval Order shall be a Final Order and have remained in full force and effect and shall not have been stayed, vacated, modified or supplemented without the prior written consent of the Buyer and the Sellers.

(p)     The waiting period (including any extensions thereof) applicable to the consummation of the transactions contemplated by this Agreement required pursuant to the HSR Act, to the extent necessary, shall have expired or been terminated.

(q)     The Sellers shall have received written notice from the Buyer prior to August 1, 2005 that the Buyer and LaSalle have agreed to the Target Net Working Capital Amount, which notice shall set forth such Target Net Working Capital Amount.

*Section 8.2     Conditions to Obligations of the Sellers.*  The obligations of the Sellers to effect the Closing are subject to the fulfillment or waiver on or before the Closing Date of the following conditions:

(a)     The representations and warranties of the Buyer contained in this Agreement or the Ancillary Documents shall be true and correct in all material respects as of the date of this Agreement and as of the Closing Date as though made on and as of such dates, except for changes therein specifically permitted by this Agreement or the Ancillary Documents.

(b)     The covenants and agreements contained herein or in any Ancillary Document to be performed or complied with by the Buyer on or prior to the Closing Date shall have been performed or complied with in all material respects which shall have been performed in all respects.

(c)     The Sellers shall have received an assignment and release from LaSalle, in form and substance reasonably satisfactory to the Sellers, evidencing the release of the Sellers from all obligations due under the LaSalle Bank Debt.

(d)     There shall be no litigation pending or, to the Buyer's knowledge, threatened, in which any injunction is sought to prevent the transactions contemplated hereby, or the transfer of the Purchased Assets to the Buyer, free and clear of all Liens, except Permitted Liens.

45

(e)     The Buyer shall have delivered:

(i)     to LaSalle the LaSalle Cash Component in cash by wire transfer of immediately available funds to the account or accounts designated by LaSalle;

(ii)     to the Sellers the Sellers' Cash Component in cash by wire transfer of immediately available funds to the account or accounts designated by the Sellers;

(iii)     to the Sellers the Bill of Sale and Assignment and Assumption Agreement, duly executed by the Buyer;

(iv)     to the Sellers each of the Equity Participation Agreements, duly executed by the Buyer; and

(v)     to the Sellers such other instruments of sale, transfer, conveyance and assignment as the Sellers may reasonably request to effect the transactions contemplated thereby.

(f)     The Sellers shall have received written notice from the Buyer on or prior to Due Diligence Date that the Buyer has satisfied or waived the Due Diligence Condition.

(g)     The Sellers shall have received written notice from the Buyer on or prior to Ratification Date that the Buyer has satisfied or waived the Ratification Condition.

(h)     The Sellers shall have received written notice from the Buyer on or prior to Key Customer Date that the Buyer has satisfied or waived the Key Customer Condition.

(i)     The Sellers shall have received written notice from the Buyer on or prior to LaSalle Debt Date that the Buyer has satisfied or waived the LaSalle Debt Condition.

(j)     The Sellers shall have received written notice from the Buyer on or prior to Key Vendor Date that the Buyer has satisfied or waived the Key Vendor Condition.

(k)     The Bankruptcy Court shall have entered (i) the Bid Procedures Order within twenty-five (25) days after the Bankruptcy Filing and (ii) the Approval Order within fifty-five (55) days after the Bankruptcy Filing; provided, that the condition contained in **Section 8.2(k)** shall be deemed satisfied and/or irrevocably waived unless the Buyer has terminated this Agreement pursuant to **Section 9.1(g)** prior to the entry of the Bid Procedures Order, and the condition in **Section 8.2(k)** shall be deemed satisfied and/or irrevocably waived unless the Buyer has terminated this Agreement pursuant to **Section 9.1(h)** prior to the entry of the Approval Order.

(l)     The Bid Procedures Order shall have remained in full force and effect and shall not have been stayed, vacated, modified or supplemented without the prior written consent of the Buyer and the Sellers.

(m)     The Approval Order shall be a Final Order and have remained in full force and effect and shall not have been stayed, vacated, modified or supplemented without the prior written consent of the Buyer and the Sellers.

(n)     All notice periods under WARN shall have expired with respect to the Employees.

(o)     The Buyer will have delivered to the Sellers a certificate, dated the Closing Date, duly executed by an officer of the Buyer to the effect of **Section 8.2(a)** and **8.2(b)**.

(p)     The waiting period (including any extensions thereof) applicable to the consummation of the transactions contemplated by this Agreement required pursuant to the HSR Act, to the extent necessary, shall have expired or been terminated.

(q)     The Sellers shall have received written notice from the Buyer prior to August 1, 2005 that the Buyer and LaSalle have agreed to the Target Net Working Capital Amount, which notice shall set forth such Target Net Working Capital Amount.

## ARTICLE IX
## TERMINATION

*Section 9.1     Termination of Agreement.*  This Agreement may be terminated at any time prior to Closing and the transactions contemplated hereby may be abandoned:

(a)     by the mutual written consent of the Sellers and the Buyer;

(b)     by the Sellers or the Buyer if any court of competent jurisdiction or governmental body, authority or agency having jurisdiction, including the Bankruptcy Court, shall have issued an order, decree or ruling or taken any other action (which order, decree, ruling or other action the Parties hereto shall use commercially reasonable efforts to lift) restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement and such order, decree, ruling or other action shall have become final and nonappealable;

(c)     by the Sellers, if there has been a material breach of any of the representations, warranties, agreements or covenants set forth in this Agreement on the part of the Buyer which, if not cured, would reasonably be expected to render the satisfaction of any of the conditions set forth in **Section 8.2** impossible and such breach has not been cured within fifteen (15) days following the Sellers' written notice of such breach; provided, that the right to terminate this Agreement under this **Section 9.1(c)** shall not be available to the Sellers if the Sellers are in material breach of this Agreement;

(d)     by the Buyer, if there has been a material breach of any of the representations, warranties, agreements or covenants set forth in this Agreement on the part of the Sellers which, if not cured, would reasonably be expected to render the satisfaction of any of the conditions set forth in **Section 8.1** (other than the Ratification Condition, the Key Customer Condition, the LaSalle Debt Condition and the Key Vendor Condition) impossible and such breach has not been cured within fifteen (15) days following the Buyer's written notice of such breach; provided, that that the right to terminate this Agreement under this **Section 9.1(d)** shall not be available to the Buyer if the Buyer is in material breach of this Agreement;

(e)    by the Sellers, if the Buyer is not the successful bidder at the Auction; provided, that the Sellers have not materially breached their obligations hereunder and have complied in all material respects with the Bid Procedures Order;

(f)    by either Party, upon written notice given to the other Party, if the Closing shall not have occurred on or before ten (10) days after entry of the Approval Order; provided, however, that the right to terminate this Agreement under this **Section 9.1(f)** shall not be available to a Party if such Party has failed to perform in all material respects its obligations under this Agreement and such failure has been the cause of, or results in, the failure of the Closing to occur on or prior to ten (10) days after entry of the Approval Order;

(g)    by the Buyer prior to the entry of the Bid Procedures Order, if the Bid Procedures Order is not entered by the Bankruptcy Court within twenty-five (25) days of the Bankruptcy Filing (or such later date as the Buyer shall agree); and

(h)    by the Buyer prior to the entry of the Approval Order, if the Approval Order is not entered by the Bankruptcy Court within fifty-five (55) days after the Bankruptcy Filing.

(i)    by the Sellers, if the Sellers have not received written notice from the Buyer (i) on or prior to the Due Diligence Date that the Due Diligence Condition has been satisfied or waived, (ii) on or prior to the Ratification Date that the Ratification Condition has been satisfied or waived, (iii) on or prior to the Key Customer Date that the Key Customer Condition has been satisfied or waived, (iv) on or prior to the LaSalle Debt Date that the LaSalle Debt Condition has been satisfied or waived, (v) on or prior to the Key Vendor Date that the Key Vendor Condition has been satisfied or waived or (vi) on or prior to August 1, 2005 that the Target Net Working Capital Amount has been agreed to by the Buyer and LaSalle and setting forth such Target Net Working Capital Amount.

(j)    by the Buyer (i) on or prior to the Due Diligence Date, if the Due Diligence Condition is not satisfied or waived by such date, (ii) on or prior to the Ratification Date, if the Ratification Condition is not satisfied or waived by such date, (iii) on or prior to the Key Customer Date, if the Key Customer Condition is not satisfied or waived by such date, (iv) on or prior to the LaSalle Debt Date, if the LaSalle Debt Condition is not satisfied or waived by such date, (v) on or prior to the Key Vendor Date, if the Key Vendor Condition is not satisfied or waived by such date, (vi) if the Sellers enter into an agreement respecting or file a motion seeking authority to consummate an Alternative Transaction in the Bankruptcy Case or file a motion in the Bankruptcy Case seeking authority to enter into or consummate any plan of complete or partial liquidation, dissolution, merger, consolidation, restructuring, recapitalization or other reorganization that is inconsistent with the consummation of the transactions contemplated by this Agreement or (vii) if the Buyer has the right to terminate this Agreement pursuant to **Section 3.5** hereof.

Section 9.2    *Effect of Termination.*  If any Party terminates this Agreement pursuant to **Section 9.1** above, all of the unperformed obligations of the Parties hereunder shall terminate without any liability of any Party to such other Party; provided, that nothing herein shall relieve any Party from any Liability for any breach of this Agreement or the Sellers from Liability (if

any) under **Section 9.3**; and provided further, that the Sellers' directors and officers shall not be liable for any termination of this Agreement pursuant to **Section 9.1(d)**.

Section 9.3    Expense Reimbursement; Break-Up Fee.

(a)    In the event (i) this Agreement is terminated by the Sellers, or by the Buyer pursuant to **Section 9.1(j)(vi)**, at a time when the Buyer is not in material breach of this Agreement (ii) the conditions set forth in **Section 8.2(f), (g), (h), (i), (j)** and **(k)(i)** were satisfied at the time of such termination (but this clause (ii) shall apply only if the respective date for satisfying or waiving such condition has arrived or passed at the time of termination) and (iii) the Sellers within 270 days thereafter consummate an Alternative Transaction with a third party other than the Buyer or any of its Affiliates, the Sellers shall pay to KPS (or its designee) an amount equal to (A) its documented reasonable out-of-pocket costs and expenses (including reasonable legal fees) incurred in connection with the transactions contemplated by this Agreement (the "Expense Reimbursement"), in an amount not to exceed $1,500,000, plus (B) a break-up fee of $2,000,000 (the "Break-Up Fee") from the proceeds of the Alternative Transaction. Further, in the event that (x) the foregoing conditions described in clauses (i) and, if applicable, (ii) of this **Section 9.3** are satisfied; (y) the Sellers enter into but do not consummate an Alternative Transaction; and (z) the Sellers retain (and have the valid right to retain free of any interest of the proposed buyer), pursuant to either a final, non-appealable order of the Bankruptcy Court or written agreement of the proposed buyer in any such Alternative Transaction, any deposit received by the Sellers in connection with such Alternative Transaction, then the Sellers shall pay to KPS (or its designee) an Expense Reimbursement in an amount not to exceed $1,500,000 from such deposit (the "AT Deposit"). Any Expense Reimbursement or Break Up Fee payable under this **Section 9.3(a)** shall constitute an administrative expense claim in the Bankruptcy Case under Sections 503(b)(1) and 507(a)(1) of the Bankruptcy Code.

(b)    The payment of the Expense Reimbursement and the Break-Up Fee shall be made by wire transfer of immediately available funds on the fifth business day following the later of (i) consummation of the Alternative Transaction and (ii) receipt by the Sellers, with copies delivered to counsel for the OCUC as well as counsel for each of LaSalle and the Other Secured Creditors, of a notice from KPS and/or the Buyer stating the reasons why such Expense Reimbursement and Break-Up Fee are due, including, if applicable, that the transactions contemplated in this Agreement have been (or will be) terminated, and attaching reasonable documentation detailing the amount of Expense Reimbursement and Break-Up Fee due, except in the case where KPS (or its designee) is entitled to an Expense Reimbursement pursuant to the penultimate sentence of **Section 9.3(a)** then such Expense Reimbursement shall be made by wire transfer of immediately available funds the day the Sellers become entitled to such AT Deposit.

# ARTICLE X
## MISCELLANEOUS

Section 10.1    Notices.    Any notice, request, instruction or other document to be given hereunder will be sent in writing and delivered personally, sent by reputable, overnight courier service (charges prepaid), sent by registered or certified mail, postage prepaid, or by facsimile, according to the instructions set forth below. Such notices will be deemed given: at the time delivered by hand, if personally delivered; one business day after being sent, if sent by reputable,

overnight courier service; at the time received, if sent by registered or certified mail; and at the time when confirmation of successful transmission is received by the sending facsimile machine, if sent by facsimile.

| | |
|---|---|
| If to any Seller: | Jernberg Industries, Inc.<br>328 West 40th Place<br>Chicago, Illinois 60609<br>Attention: R. Thomas Beecham<br>Facsimile No.: 773-268-1970 |
| With a copy (which will not constitute notice) to: | Jenner & Block LLP<br>One IBM Plaza<br>Chicago, IL 60611-7603<br>Attention: Edward J. Neveril<br>Facsimile No.: 312-840-7530 |
| If to the Buyer: | KPS Special Situation Fund II, L.P.<br>200 Park Avenue, 85th Floor<br>New York, New York 10166<br>Attention: Michael Psaros<br>Facsimile No.: 212-867-7980 |
| With a copy (which will not constitute notice) to: | Paul, Weiss, Rifkind, Wharton & Garrison LLP<br>1285 Avenue of the Americas<br>New York, New York 10019<br>Attention: Carl L. Reisner<br>Facsimile No.: 212-757-3990 |

or to such other address or to the attention of such other party that the recipient party has specified by prior written notice to the sending party in accordance with the preceding.

*Section 10.2   Expenses; No Offset.*  Except as expressly provided in this Agreement, each of the Buyer and the Sellers, and their respective Affiliates, will bear its own costs and expenses (including legal, accounting and investment banking fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby, whether or not such transactions are consummated.  Neither Party may make any offset against amounts due to the other Party pursuant to this Agreement, the Ancillary Documents or otherwise.

*Section 10.3   Seller Disclosure Schedules.*  The representations and warranties of the Sellers set forth in this Agreement are made and given subject to the disclosures contained in the Seller Disclosure Schedules.  The Sellers will not be, nor will they be deemed to be, in breach of any such representations and warranties in connection with any such matter so disclosed in the Seller Disclosure Schedules.  Where a reference is made to a disclosed document, the full contents of the document as delivered or made available to the Buyer are deemed to be disclosed. Inclusion of information in the Seller Disclosure Schedules will not be construed as an admission that such information is material to the business, operations or condition (financial or otherwise) of the Business or the Purchased Assets, taken as a whole, or as an admission of liability or

50

**Execution Copy**

obligation of the Sellers to any third party. The specific disclosures set forth in the Seller Disclosure Schedules have been organized to correspond to Section references in this Agreement to which the disclosure most clearly relate, together with appropriate cross references when disclosure is applicable to other Sections of this Agreement; provided, however, that any disclosure in the Seller Disclosure Schedules will apply to and will be deemed to be disclosed for purposes of other Sections of this Agreement to the extent it is reasonably apparent that such disclosure relates to such Section. In the event that there is any inconsistency between this Agreement and matters disclosed in the Seller Disclosure Schedules, information contained in the Seller Disclosure Schedules will prevail and will be deemed to be the relevant disclosure.

Section 10.4  *Bulk Sales or Transfer Laws*. The Buyer waives compliance by the Sellers with the provisions of any bulk sales laws that may be applicable to the transactions contemplated by this Agreement.

Section 10.5  *Assignment; Successors and Assigns*. Neither this Agreement nor any of the rights, interests or obligations provided by this Agreement may be assigned by either Party (whether by operation of Law or otherwise) without the prior written consent of the other Party; provided, however, that, without the consent of the Sellers, the Buyer may assign and delegate its rights under this Agreement to one or more Affiliates of the Buyer or to any party providing financing to the Buyer; provided further that, no such assignment or delegation shall relieve the Buyer of its obligations under this Agreement. Subject to the preceding sentence and except as otherwise expressly provided herein, this Agreement will be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns.

Section 10.6  *Amendment; Waiver*. This Agreement may be amended by a written instrument executed and delivered by the Sellers and the Buyer. At any time prior to the Closing, the Parties may extend the time for performance of or waive compliance with any of the covenants or agreements of the other Party to this Agreement, and may waive any breach of the representations or warranties of such other Party. No agreement extending or waiving any provision of this Agreement will be valid or binding unless it is in writing and is executed and delivered by or on behalf of the Party against which it is sought to be enforced.

Section 10.7  *Severability; Specific Performance*. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under Law, but if any provision of this Agreement is held to be prohibited by or invalid under Law, such provision will be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of this Agreement. Each Party acknowledges and agrees that the other Party may be irreparably damaged if any provision of this Agreement is not performed in accordance with its terms or otherwise is breached. Accordingly, each Party agrees that the other Party may be entitled, subject to a determination by a court of competent jurisdiction, to injunctive relief to prevent any such failure of performance or breach and to enforce specifically this Agreement and any of the terms and provisions hereof.

Section 10.8  *Counterparts*. This Agreement may be executed in two or more counterparts, each of which will be deemed an original, but all such counterparts taken together will constitute one and the same Agreement. All signatures of the parties to this Agreement may be transmitted by facsimile, and such facsimile will, for all purposes, be deemed to be the

original signature of such party whose signature it reproduces, and will be binding upon such party.

*Section 10.9    Descriptive Headings.*  The descriptive headings of this Agreement are inserted for convenience only and will not constitute a part of this Agreement.

*Section 10.10    No Third-Party Beneficiaries.*  This Agreement will not confer any rights or remedies upon any Person or entity other than the Parties hereto, their respective successors and permitted assigns.

*Section 10.11    Entire Agreement.*    This Agreement and the Ancillary Documents collectively constitute the entire agreement among the Parties and supersede any prior and contemporaneous understandings, agreements or representations by or among the Parties, written or oral, that may have related in any way to the subject matter hereof, including the letter of intent dated May 30, 2005 by and between KPS and Jernberg (the "LOI"), which LOI is terminated as of the date hereof.

*Section 10.12    Exhibits and Schedules.*  The Exhibits and Schedules attached to this Agreement are made a part of this Agreement as if set forth fully herein.

*Section 10.13    GOVERNING LAW.*  THIS AGREEMENT WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT GIVING EFFECT TO ANY LAW OR RULE THAT WOULD CAUSE THE LAWS OF ANY JURISDICTION OTHER THAN THE STATE OF DELAWARE TO BE APPLIED.

*Section 10.14    Jurisdiction.*  Buyer and Sellers irrevocably and unconditionally consent to submit to the jurisdiction of the Bankruptcy Court for any litigation arising out of or relating to this Agreement and the transactions contemplated hereby (and agree not to commence any litigation relating hereto except in the Bankruptcy Court).

*Section 10.15    WAIVER OF JURY TRIAL.*    EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE ANCILLARY AGREEMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY.

*Section 10.16    Exculpation.*  Notwithstanding anything to the contrary in this Agreement, none of the Sellers' directors or officers shall have or incur any liability to any Person, including the Parties for any act or omission in connection with or relating to this Agreement, including any agreements, disclosures, representations, warranties or covenants, either express or implied. All such personal liability, if any is expressly waived by the Parties.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, the Parties have duly executed and delivered this Agreement on the date first written above.

JERNBERG INDUSTRIES, INC.

By: _____
Name:
Title: PRESIDENT

JERNBERG SALES, INC.

By: _____
Name:
Title: VICE PRESIDENT

IRON MOUNTAIN INDUSTRIES, LLC

By: _____
Name:
Title: PRESIDENT

HEPHAESTUS HOLDINGS, INC.

By: _____
Name:
Title:

53

IN WITNESS WHEREOF, the Parties have duly executed and delivered this Agreement on the date first written above.

JERNBERG INDUSTRIES, INC.

By: _____
      Name:
      Title:

JERNBERG SALES, INC.

By: _____
      Name:
      Title:

IRON MOUNTAIN INDUSTRIES, LLC

By: _____
      Name:
      Title:

HEPHAESTUS HOLDINGS, INC.

By: _____
      Name: David Shapiro
      Title:  President